IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

GEORGE HARTZMAN,                    )
                                    )
            Plaintiff,              )
                                    )
    v.                              )        1:14CV808
                                    )
WELLS FARGO & COMPANY,              )
                                    )
                                    )
            Defendant.              )


<u>**MEMORANDUM OPINION AND ORDER**</u>

**OSTEEN, JR., District Judge**

        Presently before this court is a Motion to Dismiss filed

by Defendant Wells Fargo & Company ("Defendant") (Doc. 37.)

Plaintiff George Hartzman ("Plaintiff") has responded (Doc. 39),

and Defendant has replied. (Doc. 40.)[1]  This matter is now ripe

for resolution, and for the reasons stated herein, Defendant's

Motion to Dismiss will be granted in part and denied in part.

**I.    <u>PROCEDURAL HISTORY</u>**

        Plaintiff commenced this action on September 22, 2014, by

filing a complaint alleging that Defendant retaliated against

him for reporting Defendant's allegedly fraudulent practices, in

_____

        [1] Plaintiff has also filed what he has termed a "Post Hearing
Brief." (<u>See</u> Doc. 42.)  The court did not grant permission for
such a filing, and it has not been considered as part of this
opinion.

violation of the Sarbanes-Oxley whistleblower protection provisions set forth in 18 U.S.C. § 1514A(b). (See Complaint ("Compl.") (Doc. 1).) Plaintiff then amended his Complaint, filing a "Supplement to Initial Complaint" that included attachments setting forth additional factual allegations. (See Suppl. to Initial Compl. (Doc. 8).) On November 14, 2014, Defendant filed its first motion to dismiss. (Doc. 19.) In response, Plaintiff moved to amend his pleadings a second time, filing alongside his motion a proposed "First Amended Complaint" that was 144 pages in length. (Docs. 24, 24-1.) The Magistrate Judge granted in part and denied in part Plaintiff's motion, allowing Plaintiff to amend his pleading only as to his Sarbanes-Oxley retaliation claim, but ordering him to do so "without the addition of John Stumpf or Robert Steel as Defendants or the inclusion of any causes of action beyond his claim of retaliation related to the Sarbanes-Oxley Act." (Mem. Op. & Order (Doc. 35) at 19.) Plaintiff filed the current Second Amended Complaint on March 27, 2015 (Doc. 36). Defendant moved to dismiss, and the issue has now been fully briefed. (See Docs. 37-40.)

## II. <u>BACKGROUND</u>[2]

Plaintiff worked as a Financial Advisor for Wells Fargo Advisers from 1993 until he was terminated on October 8, 2012. (Second Amended Complaint ("Second Am. Compl.") (Doc. 36) ¶ 1.) Plaintiff alleges that, while employed by Defendant,[3] he raised "federal criminal concerns" through a confidential company ethics reporting channel. (<u>Id.</u> ¶ 3.) Plaintiff alleges that he brought concerns to the Wells Fargo Ethics Line on three different occasions. (<u>Id.</u> ¶ 13.) On November 29, 2011, Plaintiff submitted a complaint he summarizes as involving "Accounting Irregularities," which included "concerns raised about accounting, internal accounting controls, and auditing matters." (<u>Id.</u>) On December 2, 2011, Plaintiff submitted a complaint he summarizes as involving "Falsification of Company Records,"

---

[2] Plaintiff's Second Amended Complaint is dense, and frequently hops back and forth in both the time period and subject matter that it refers to, as well as in which allegations it discusses. Given that Plaintiff has failed to lay out even basic facts in an organized manner, the court will limit its discussion of the facts to what it can glean from the Second Amended Complaint.

[3] Plaintiff was apparently employed by Wells Fargo Advisors, LLC, rather than "Wells Fargo," as originally named in the pleadings. In an attempt to cure this, Plaintiff has amended his complaint to assert claims against "Wells Fargo & Company or one or more of its direct or indirect subsidiaries." The court notes that Defendant has reserved its objections on this issue.

- 3 -

which apparently concerned the "accuracy and completeness of corporate financial reports." (Id.)  Finally, on December 3, 2011, Plaintiff submitted a complaint he summarizes as involving "Auditing Irregularities," wherein he quoted Wells Fargo's Code of Ethics and Business Conduct, which states that:

> All business transactions . . . must be properly and
> accurately recorded . . . in accordance with
> applicable accounting standards, legal requirements,
> and Wells Fargo's system of internal controls.
> Falsification of any company . . . information is
> prohibited. Falsification refers to knowingly
> misstating, . . . or omitting or deleting information
> from a Wells Fargo record or system which results in
> something that is untrue, fraudulent or misleading.

(Id.)[4]

While it is difficult to glean from the pleadings the exact nature of Plaintiff's concerns, they apparently boil down to an allegation that Wells Fargo violated its Securities and Exchange Commission ("SEC") reporting requirements by omitting from its filings that it had received (or, at minimum, by omitting the size and source of) what Plaintiff refers to as "secret loans"[5]

---

[4] It is unclear from Plaintiff's Second Amended Complaint how Wells Fargo's Code of Ethics and Business Conduct specifically relates to his claims.

[5] These loans are apparently funds that Wells Fargo received access to under the federal Term Auction Facility during the financial crisis.

- 4 -

from the Federal Reserve, and that certain customer financial planning documents known as "Envision Reports" fraudulently failed to include investment costs in their projections of client finance goals. (Id. ¶¶ 60-113.)

On January 4, 2012, Plaintiff was told that his concerns were being investigated, and that unless some new issue arose, per company policy, there would be no further communication to Plaintiff on the matter. (Id. ¶ 50.) At some point after Plaintiff raised these concerns, Wells Fargo apparently hired an outside consulting firm, Oyster Consulting, LLC ("Oyster"), to investigate his claims. (See id. ¶¶ 14-21.) Plaintiff contends that this report, which concludes both that Plaintiff's complaints were given a fair hearing by Wells Fargo and that his complaints were without merit both as to Wells Fargo's financial statements and as to the Envision Reports, is essentially a sham.[6] (Id.)

---

[6] Plaintiff's contentions regarding this report range from complaints that Oyster never interviewed anyone outside of Wells Fargo other than "shills" of the alleged con to allegations that the report was "withheld" from him in violation of Sarbanes-Oxley and RICO. (See, e.g., Sec. Am. Compl. (Doc. 36) ¶¶ 14, 19-20, 32, 85, 90.) Plaintiff also argues that the conclusion of the report itself (which absolves Wells Fargo) violates Sarbanes-Oxley and RICO, although it is unclear why. (Id. ¶¶ 15, 32.)

- 5 -

After the investigation began, Plaintiff continued to raise his concerns with Wells Fargo internally, both by repeatedly attempting to follow up with the individuals in charge of his original ethics line complaints and by sending emails to multiple executives at Wells Fargo on March 4, 2012, including Danny Ludeman, the CEO of Wells Fargo Advisors, LLC, and John Stumpf, the CEO of Wells Fargo & Co. (Id. ¶ 36.) Plaintiff was told to keep his communications regarding his concerns limited to the Ethics Line, (id. ¶ 41), and was told that he needed to cease his activities on several occasions, including by email on January 4, 2012, and January 19, 2012. (Id. at ¶¶ 50-53.) Plaintiff also at some point apparently posted information about his concerns on his personal blog and began raising these issues during teaching events, because he was told in mid-June of 2012 both to cancel any future events and to take down his blog. (Id. ¶ 77-78). Plaintiff was issued a Formal Warning on March 13, 2012, (id. ¶ 36), a Final Warning on July 23, 2012, (id. ¶ 79), and was terminated on October 8, 2012. (Id. ¶ 101.)

## III. <u>LEGAL STANDARD</u>

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim

- 6 -

to relief that is plausible on its face.'" Ashcroft v. Iqbal,
556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly,
550 U.S. 544, 570 (2007)).  A claim is facially plausible when
the plaintiff provides enough factual content to enable the
court to reasonably infer that the defendant is liable for the
misconduct alleged.  Id.  The pleading setting forth the claim
must be "liberally construed" in the light most favorable to the
non-moving party, and allegations made therein are taken as
true.  Jenkins v. McKeithen, 395 U.S. 411, 421 (1969).  However,
the "requirement of liberal construction does not mean that the
court can ignore a clear failure in the pleadings to allege any
facts [that] set forth a claim."  Estate of Williams-Moore v.
All. One Receivables Mgmt., Inc., 335 F. Supp. 2d 636, 646
(M.D.N.C. 2004).

Rule 12(b)(6) protects against meritless litigation by
requiring sufficient factual allegations "to raise a right to
relief above the speculative level" so as to "nudge[] the[]
claims across the line from conceivable to plausible." Twombly,
550 U.S. at 555, 570; see Iqbal, 556 U.S. at 680. Under Iqbal,
the court performs a two-step analysis. First, it separates
factual allegations from allegations not entitled to the
assumption of truth (i.e., conclusory allegations, bare

- 7 -

assertions amounting to nothing more than a "formulaic recitation of the elements"). Iqbal, 556 U.S. at 681. Second, it determines whether the factual allegations, which are accepted as true, "plausibly suggest an entitlement to relief." Id. "At this stage of the litigation, a plaintiff's well-pleaded allegations are taken as true and the complaint, including all reasonable inferences therefrom, are liberally construed in the plaintiff's favor." Estate of Williams-Moore, 335 F. Supp. 2d at 646.

Additionally, the court notes here that Plaintiff has chosen to proceed pro se. Pro se plaintiffs are entitled to a greater degree of leniency in construing their pleadings. See Beaudett v. City of Hampton, 775 F.2d 1274, 1278 (4th Cir. 1985). "What might be a meritorious claim on the part of a pro se litigant unversed in the law should not be defeated without affording the pleader a reasonable opportunity to articulate his cause of action." Gordon v. Leeke, 574 F.2d 1147, 1152 (4th Cir. 1978). However, while pro se complaints are to be construed liberally, they still must plead sufficient facts to state a claim. Id. With this standard in mind, the court now turns to the claims in Plaintiff's Second Amended Complaint.

## IV. <u>PLAINTIFF'S RICO CLAIM</u>

The court turns first to Plaintiff's allegation that Defendant violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"). At the outset, the court notes that these claims are improperly brought by Plaintiff. After Defendant moved to dismiss for the first time on November 14, 2014, (<u>see</u> Doc. 19), Plaintiff moved for leave to amend and attached a proposed Amended Complaint. (<u>See</u> Docs. 24, 24-1.) In granting Plaintiff's motion in part, the Magistrate Judge held that Plaintiff was given leave to amend <u>only</u> as to his Sarbanes-Oxley retaliation claim. (Mem. & Op. Order (Doc. 35) at 19.) The Magistrate Judge specifically noted that Plaintiff's proposed Amended Complaint contained no discussion or factual allegations that plausibly supported a RICO claim, (<u>see</u> <u>id.</u> at 12), and that the only claim in the proposed Amended Complaint that was not futile for purposes of amendment was Plaintiff's cause of action under Sarbanes-Oxley. (<u>Id.</u> at 15.) As such, Plaintiff's current pleading is improper in that it includes a claim for which Plaintiff was specifically denied leave to amend.

However, even if Plaintiff's RICO claim was properly before this court, it still fails to state a claim upon which relief can be granted, and is thus dismissed in either case.

Title 18 U.S.C. § 1962, in relevant part, makes it unlawful to conduct or participate, directly or indirectly, in the conduct of an enterprise's affairs through a pattern of racketeering activity. <u>See</u> 18 U.S.C. § 1962(c).[7]

In considering his <u>pro</u> <u>se</u> pleading, Plaintiff appears to be alleging that the acts at issue are that: (1) he was retaliated against for whistleblowing in violation of 18 U.S.C. § 1513(e), and (2) Wells Fargo committed mail, wire, and/or securities fraud via allegedly fraudulent SEC filings and Envision Reports.[8]

---

[7] A "pattern" of racketeering activity is defined in 18 U.S.C. 1961(5) as "<u>at least two</u> acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years . . . after the commission of a prior act of racketeering activity." 18 U.S.C. 1961(5) (emphasis added).

[8] Plaintiff also claims that the retention of Defendant's current counsel by Defendant is a predicate act under RICO. (Second Am. Compl. (Doc. 36) ¶ 26; Pl.'s Resp. at 2.) Plaintiff provides no legal or factual basis for this other than contending that Defendant's counsel was also involved in the litigation over the merger between Wells Fargo and Wachovia, an apparently irrelevant fact upon which there is no further elaboration. Plaintiff thus fails to allege sufficient facts to support this contention.

Plaintiff cites only to <u>DeGuelle v. Camilli</u>, 664 F.3d 192 (7th Cir. 2011), and no Fourth Circuit precedent for the proposition that a retaliatory discharge claim under Sarbanes-Oxley can give rise to a predicate act for purposes of RICO.[9] However, even without considering the lack of precedent, Plaintiff's claim suffers from a larger flaw. As stated above, to properly allege a RICO claim, Plaintiff must sufficiently allege <u>two</u> related predicate acts. <u>See</u> <u>supra</u> note 7.

Even assuming that his first alleged predicate act, retaliatory termination, would be recognized as such in the Fourth Circuit, Plaintiff fails to sufficiently allege a <u>second</u> predicate act. Plaintiff's Second Amended Complaint is far from clear on what he alleges the relevant predicate acts to be, as most of the Second Amended Complaint describes the allegedly improper way his complaints were handled by Wells Fargo and his eventual termination. The court finds that the only allegation that could possibly form the basis of a second predicate act under RICO is Plaintiff's allegation that Defendant committed

---

[9] Further, as acknowledged by that court, most jurisdictions hold that such a discharge claim <u>cannot</u> be the basis of a predicate act. <u>See</u> <u>DeGuelle</u>, 644 F.3d at 201 n.3 (emphasis added).

mail, wire and/or securities fraud via the Envision Reports.[10] (Second Am. Compl. (Doc. 36) ¶ 126; 18 U.S.C. §§ 1341, 1343, 1348.)

Allegations under all three of these statutes must meet the more rigorous pleading requirements for fraud under Rule 9(b) of the Federal Rules of Civil Procedure. Under 9(b), plaintiffs must plead "the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby" with specificity. See Harrison v. Westinghouse Savannah River Co., 176 F.3d 776, 784 (4th Cir. 1999) (citing Rule 9(b)).

Not only has Plaintiff failed to meet these rigorous pleading requirements, but, as detailed more thoroughly below, Plaintiff has also failed to plausibly plead that the Envision Reports, or Defendant's use of them, are in fact fraudulent at all.

---

[10] Plaintiff's claims regarding the allegedly false SEC filings cannot constitute a predicate act because the filings that Plaintiff alleges were false occurred in 2008 and 2009, and Plaintiff makes no allegations that Wells Fargo is continuing to receive funds from the Federal Reserve or that it is continuing to file misleading reports. (See Second Am. Compl. (Doc. 36).) Because there is no alleged threat of continued activity, this claim would necessarily fail under the Supreme Court's relationship plus continuity test as laid out in H.J. Inc. v. Nw. Bell Tel. Co., 492 U.S. 229 (1989).

Plaintiff alleges that the Envision Reports were utilized to create "higher rates of client retention through frauds" and that:

> The more confident clients feel, the longer and more money Financial Advisors should make by retaining more clients, increasing Defendant profits. The better an Envision plan report looks and continues to appear . . . over time, the longer clients should trust and maintain a relationship, increasing advisors' income and Wells Fargo profits, in violation of federal laws without repercussion.

(Second Am. Compl. (Doc. 36) ¶ 76.)

Plaintiff posits that these reports were fraudulent because they failed to disclose "investment fees" in their projections of clients' future progress towards financial goals. The court notes that there are no allegations that customers were ever lied to about the fees connected to any Wells Fargo investment accounts, that whether fees would impact their investment goals, or that analysts never discussed the fees that clients were being charged for various investments and how those fees affected to future projections. Rather, Plaintiff's allegations center around a complaint that Defendant purposefully left investment fees out of their projections in the reports in order to make a client's plan look more favorable, thus retaining the client as a customer.

While the Envision Reports apparently contained projections of various investment scenarios to first generate discussion about and to later track a client's goals and progress, there are no allegations that the actual results of their investments were being concealed from clients, or that any fees that had actually been charged were actually being concealed from clients.[11]  Plaintiff's Second Amended Complaint itself also alleges that Envision Reports do not represent offers to buy or sell securities, nor are they financial plans. Rather, they are "intended as a discussion document." (Id. ¶ 66.)  The reports contain explicit disclaimers that detail that "[t]he [Envision Plan] does not in any way supersede [a client's] statements, policies or trade confirmations, which [Wells Fargo] considers the only official and accurate records or your accounts or policies," that "Envision is not a financial plan," and that the Envision plans are distributed "solely for information

_____

[11] The court also notes that Plaintiff's pleading includes an allegation that financial advisors were given the option to include return discount rates in their projections under a drop down menu entitled "Advanced Plan Assumptions." (Second Am. Compl. (Doc. 36) ¶ 63).  If an advisor chose to include a discount rate to reflect investment costs (ranging from 0% to 3%), it would be reflected in the report.  As discussed further, the choice of whether to include a rate or not was based on several factors and was more complicated than Plaintiff alleges.

purposes." (Id. ¶ 67.) Given that Plaintiff himself alleges that customers were provided notice that the plans were merely for discussion, that the fees were in fact disclosed, and more importantly, that clients were told that the plan actually chosen by the client "may or may not match the risk and return characteristics of the recommended model over time due to security selection, inability to invest in the indices, and other factors," it is unclear at best what was fraudulent about these reports or how clients were in any way harmed. (Id.)

As such, the court finds that Plaintiff has failed to plausibly plead a predicate act of mail, wire, or securities fraud related to the Envision Reports because Plaintiff has failed to plausibly plead that any fraud actually occurred.

Thus, Plaintiff has failed to allege a pattern of activity sufficient to constitute a violation of RICO, and that claim will be dismissed.

## V. __PLAINTIFF'S SARBANES-OXLEY CLAIM__

Plaintiff also claims that Wells Fargo retaliated against him for whistleblowing, in violation of the Sarbanes-Oxley Act ("SOX"). Title VIII of SOX is designated as the Corporate and Criminal Fraud Accountability Act of 2002. Section 806 of this Act, codified at 18 U.S.C. § 1514A, provides "whistleblower"

- 15 -

protection to employees of publicly traded companies. SOX
prohibits retaliation against an employee who "provide[s]
information, cause[s] information to be provided, or otherwise
assist[s] in an investigation regarding any conduct which the
employee reasonably believes constitutes" mail, wire, or
securities fraud, a violation of any rule or regulation of the
SEC, or a violation of any federal law relating to fraud against
shareholders. 18 U.S.C. 1514A(a)(1).

A plaintiff asserting a SOX whistleblower claim must show
that: "(1) []he engaged in protected activity; (2) the employer
knew that []he engaged in the protected activity; (3) []he
suffered an unfavorable personnel action; and (4) the protected
activity was a contributing factor in the unfavorable action."
Feldman v. Law Enf't Assocs. Corp., 752 F.3d 339, 344 (4th Cir.
2014). Protected activity under this statute is "report[ing]
conduct that [the employee] reasonably believes constituted a
violation of [certain] federal law[s]." Id. at 344 n.5. Under
this standard, a plaintiff need not prove that the employer's
conduct actually constituted fraud, only that the employee had
"both a subjective belief and an objectively reasonable belief"
that the conduct was illegal. Welch v. Chao, 536 F.3d 269, 277
n.4 (4th Cir. 2008). An objectively reasonable belief is present

when "a reasonable person in [Plaintiff's] position would have believed that the conduct constituted a violation." Livingston v. Wyeth, 520 F.3d 344, 352 (4th Cir. 2008) (emphasis added). As such, to qualify for protection, Plaintiff's belief that the alleged activities were illegal must have been objectively reasonable to a person with Plaintiff's years of experience as a financial advisor and as a teacher of CPA ethics courses.

**A.    Plaintiff's Alleged Protected Activity**

As stated above, for an activity to be protected, Plaintiff must have had both a subjective belief and an objectively reasonable belief that his employer's conduct violated the law. See Welch, 536 F.3d at 277 n.4.  Plaintiff essentially contends that he "blew the whistle" on two situations:  (1) that Defendant failed to include certain funds received from the Federal Reserve (the "secret loans") in their SEC filings from 2008 and 2009, and (2) that Defendant's Envision Reports failed to include client costs in their projections, allegedly constituting mail, wire, and/or securities fraud.  (See Second Am. Compl. (Doc. 36) ¶¶ 12, 60.)

There is apparently no dispute as to Plaintiff's subjective belief that Defendant was violating the law.  The dispute instead centers on whether or not Plaintiff, as a financial

- 17 -

advisor with years of experience, had an objectively reasonable belief that these actions violated the law.

## 1. **The Envision Reports**

As in his RICO claim, Plaintiff alleges that the Envision Reports were fraudulent because they failed to include investment fees in their projections of future returns, and as such, Wells Fargo was engaging in mail and wire fraud by disseminating the misleading reports to customers. (Second Am. Compl. (Doc. 36) ¶¶ 65-76.)  The Envision program and the corresponding reports are client service and contact tools that Wells Fargo investment advisors use to develop financial goals with clients. (Id. ¶ 66.)  Envision essentially helps Wells Fargo advisors and clients discuss the client's financial goals, what sort of investments and returns over time will be needed to achieve them, and then map out a plan to achieve those goals.

Because the Envision Reports are written documents that relate to the use of an Investment Analysis Tool, they are subject to Rule 2214 of the Financial Industry Regulatory Authority ("FINRA"), a limited exception to FINRA Rule 2210. FINRA Rule 2210 governs communications by the financial industry with the public.  (See FINRA Rule 2210; Second Am. Compl. ¶¶ 73-74.)  FINRA Rule 2214(c) notes that a "member may provide an

investment analysis tool (whether customers use the member's tool independently or with assistance from the member), written reports indicating the results generated by such tool and related retail communications" if the tool complies with several rules.  See FINRA Rule 2214(c).  These requirements include that the communication must (1) describe the criteria and methodology used, including the tool's limitations and assumptions, (2) explain that results may vary, (3) if applicable, describe the universe of investments used in the analysis and explain how and why certain securities are chosen or favored, and (4) display a disclosure that states: "IMPORTANT: The projections or other information generated by [name of investment analysis tool] regarding the likelihood of various investment outcomes are hypothetical in nature, do not reflect actual investment results and are not guarantees of future results."  FINRA Rule 2214(c)(4).

It appears that the Envision Reports comply with all of these requirements.  Plaintiff himself notes the presence of the required disclaimer on the reports, and cites to a sample Envision Report that complies fully with the other requirements.  Notably, this report also includes investment fees in its projections.  (See Second Am. Compl. (Doc. 36) ¶¶ 67, 69.)

- 19 -

Further, the court notes that Wells Fargo would have been required to file a sample report with FINRA, and Plaintiff has made no allegations that FINRA ever objected to these reports in any way.[12]

While the court acknowledges that the relevant inquiry is not whether the Envision Reports _are in fact_ fraudulent, the court also finds that Plaintiff's belief that these plans constituted a violation of any relevant law was not objectively reasonable for a person with Plaintiff's experience and background.

First, as Plaintiff himself alleges, the reports contain express disclaimers noting that (1) the reports are not predictions of the future, (2) the projections are not reflective of actual investment results, (3) the reports may not include all costs associated with investments, and (4) the statements in the plans regarding a client's assets and investments do not in any way supersede the client's actual policy statements or trade confirmations. (_See_ Second Am. Compl. (Doc. 36) ¶¶ 66-69.)

---

[12] The court again notes that the reports were at the very least _capable_ of displaying a return discount rate in their projections and that the selection of whether or not to incorporate that variable was apparently left up to individual financial advisers. (_See_ _id_. ¶ 63.)

Second, the internal document Plaintiff cites regarding how to model a return discount rate clearly explains that a financial advisor should base the decision of whether or not to include a return discount rate on the type of assets owned by a client and his or her individual situation and goals. (<u>Id.</u> ¶ 63.)[13] The import of this is that applying a particular discount rate would <u>not</u> be appropriate for all clients, and the choice of which rate to use, if any at all, would differ from client to client depending on the nature and deployment of that clients assets. The intimation of Plaintiff's allegations, given a liberal reading in light of his <u>pro se</u> status, is either

---

[13] The court notes that this document also explains that if a financial adviser chooses to add a return discount rate, that rate is applied across returns generally at the chosen percentage. (Second Am. Compl. (Doc. 36) ¶ 63). The document explains that advisors should consider several factors before employing a return discount rate, including the types of fees that clients are paying for their various assets and which of the client's assets are external (i.e., not held with or managed by Wells Fargo), such as, real estate holdings or partnership shares. This is because the percentage discount rate is simply an estimation tool used to predict asset growth across a portfolio that may include many different types of assets, which may or may not have fees associated with them and may or may not be managed by Wells Fargo. As such, the decision of whether or not to employ a discount return rate would be made based on the particular portfolio of the client in order to provide the most accurate projection possible. Just as importantly, the decision to include a discount return rate may not be fully indicative of the actual fees that a client is incurring for various asset classes, or the structure and effect of those fees on future returns.

that the Envision Reports hide fees that Wells Fargo itself is charging its clients, giving a false sense of projected growth, or that the Envision Reports purposefully over-estimate projected growth by omitting all fees across a client's entire portfolio, in order to maintain client satisfaction with a financial plan. Neither appears to be the case.

The Envision Reports are apparently a way for financial planners to project asset and investment growth across all of a client's assets included in the plan's forecast, using data drawn from the advisors' knowledge of the client's assets. The hypothetical nature of such a projection exercise is exactly why such reports are required to have disclaimers regarding their accuracy. The decision to include a discount rate or not would be based upon the mix of assets that the client actually owns and the particular characteristics of those assets, and as such, failure to include one is simply not per se fraudulent.

Finally, Plaintiff does not allege that clients were ever lied to about how fees affected projections, that they were lied to about what fees were being charged by Wells Fargo, or that any other information of this nature was purposefully withheld from clients. Plaintiff simply alleges that the failure to include a discount rate, standing on its own, was fraudulent and

intended to "create a false impression of fortune" in order to retain customers. (See id. ¶ 75.) Such a conclusory allegation simply cannot be credited.

In sum, Plaintiff's allegations regarding the Envision Reports stem from either a mischaracterization or a misunderstanding of both the contents and function of the Envision Reports. As stated above, the objective reasonableness of Plaintiff's belief must be taken in the light of his experience and credentials. See Allen v. Admin. Review Bd., 514 F.3d 468, 477 (5th Cir. 2008); Welch v. Cardinal Bankshares Corp., ARB Case No. 05-064, 2007 WL 1578493, at *5 (ARB May 31, 2007). Given Plaintiff's experience both working with the Envision Reports and as a financial advisor for Wells Fargo, his belief that these reports were part of some sort of scheme to defraud customers is not objectively reasonable, and as such, his claim as to the Envision Reports will be dismissed.

### 2. Wells Fargo's SEC Filings

Plaintiff also contends that he blew the whistle on Defendant by alleging that it had fraudulently failed to include in its SEC filings that it had received Government funds under the Term Auction Facility ("TAF") in violation of federal securities laws. (See, e.g., Second Am. Compl. (Doc. 36) ¶ 12.)

- 23 -

Defendant contends first that Plaintiff's activity is not protected because he raised only public information that he learned about from a Bloomberg News article. (See Def.'s Mem. in Supp. of Mot. to Dismiss ("Def.'s Mem.") (Doc. 38) at 10-11.) This court first notes that the cases that Defendant has cited support for this proposition deal with whistleblower statutes other than SOX. Further, several of those cases have since been in effect overruled by Congress. For example, Meuwissen v. Department of Interior, 234 F.3d 9 (Fed. Cir. 2000), held that a public employee was not protected under the Whistleblower Protection Act of 1989 ("WPA") when disclosing information that was already publicly known. Id. at 13. After this holding, Congress expressly overruled this case and amended the statute to specifically include disclosures of already public information. See S. Rep. No. 112-155, at *5 (2012); 5 U.S.C. § 2302(f)(1)(B). Both other cases cited by Defendant relate to state whistleblower statutes, and cite to Meuwissen as support for the proposition that public information is excluded from protection.

However, even were this not the case, the Bloomberg article cited by Defendant merely details that the Federal Reserve gave loans to major banks, and that those loans were not disclosed to

- 24 -

lawmakers. (See _Secret Fed Loans Gave Banks $13 Billion Undisclosed to Congress_, Bloomberg Business (November 27, 2011, 7:01 PM), http://www.bloomberg.com/news/articles/2011-11-28/secret-fed-loans-undisclosed-to-congress-gave-banks-13-billion-in-income.)  The article includes no information specific to Wells Fargo outside of naming them as a recipient of monies, and never discusses Wells Fargo's securities filings or their contents. _Id_. Plaintiff's allegations that the loans to Wells Fargo were not disclosed in any SEC filing are not contained in this article, nor are the size of the loans received by Wells Fargo. As such, it does not appear to this court that Plaintiff's concerns were in fact entirely public before he raised them.

As noted above, it does not appear that Plaintiff's subjective belief about his allegations is in question. Although it is an extremely close issue as to the sufficiency of both the specificity and plausibility of Plaintiff's allegations on this issue, the court finds that Plaintiff has met his burden of pleading an objectively reasonable belief regarding Wells Fargo's alleged failure to include the receipt of federal monies in its SEC filings. The strength and veracity of those pleadings will be determined at a later stage.

Several facts found in the Second Amended Complaint support the plausible pleading of objective reasonableness of Plaintiff's belief.[14]  Plaintiff alleges that Defendant submitted Sarbanes-Oxley Section 302 certifications that did not include "unencumbered collateral pledged on December 20, 2007, at the beginning of Defendant's first [Federal Reserve] offered Term Auction Facility (TAF) loan" which Plaintiff alleges represents a massive undisclosed credit line that was not properly disclosed in Defendant's SEC filings. (Second Am. Compl. (Doc.

---

[14] It appears to this court that Plaintiff wishes to incorporate by reference his prior filings, which contain allegations that, although they were the basis of the Magistrate Judge allowing his amendment to proceed, are not contained in the current operative pleadings. (See, e.g., Second Am. Compl. (Doc. 36) ¶ 13 (noting that certain allegations are "detailed in Plaintiff's prior filings").)  Federal Rule of Civil Procedure 10(c) allows for the adoption by reference of a prior pleading. Fed. R. Civ. P. 10(c). "Although there is no prescribed procedure for referring to incorporated matter, the references to prior allegations must be direct and explicit, in order to enable the responding party to ascertain the nature and extent of the incorporation." Ghazzaoui v. Anne Arundel Cty., Md., Civil Action No. ELH-14-1410, 2014 WL 3973037, at *4 (D. Md. Aug. 11, 2014).  Even considering his pro se status, Plaintiff has failed to meet that standard here, where he merely references his prior filings in passing.  Plaintiff has filed multiple prior pleadings, and Defendant cannot be expected to defend against all of them, at least one of which is over 100 pages in length, and all of which are convoluted and confusing. Further, Plaintiff has demonstrated proper use of Rule 10(c) in his current complaint, where he incorporates prior paragraphs by reference to their specific numbers.  As such, this court will not consider Plaintiff's prior pleadings, which became inoperative when the instant pleading was filed.

- 26 -

36) ¶ 12.) Defendant also alleges that the SEC at some point inquired about these SEC filings, citing to a letter between Wells Fargo and the SEC. (Id. ¶ 21.)  Finally, Plaintiff alleges both that the Securities Division of the North Carolina Department of the Secretary of State found enough merit to his concerns on this issue to refer them to FINRA and the SEC, and former SEC officials who were interviewed about the issue found plausible violations among his concerns.  (Id. ¶ 86.)

Taking his allegations as true, Plaintiff has alleged that: (1) Defendant received large low-interest loans from the Government; (2) those loans were not disclosed as required in their SEC filings; and (3) other financial experts saw these facts as a problem. (Id. ¶¶ 12, 14, 21, 86.)  At this stage, Plaintiff has alleged enough to show the objective reasonableness of his concerns.  If financial experts and the SEC itself were concerned about the materiality of these non-disclosures and possible violations of the securities laws, it is contrary to reason to find it unreasonable for Plaintiff to have believed they were violations as well.  As such, the court finds that Plaintiff has alleged that he had an objectively reasonable belief that these actions constituted a violation of the law.

**B.  <u>Plaintiff's Adverse Personnel Decision</u>**

There appears to be no dispute as to the second and third elements that Plaintiff must allege, namely that: (1) Defendant was aware of Plaintiff's protected activity, and (2) Plaintiff suffered an adverse personnel decision when he was given a formal warning and ultimately terminated.  As such, the only remaining relevant inquiry is whether or not Plaintiff's reporting of these believed violations was a "contributing factor" in that adverse personnel decision.  <u>See</u> <u>Livingston</u>, 520 F.3d at 351-52.

"A contributing factor is 'any factor, which alone or in combination with other factors, tends to affect in any way the outcome of the decision.'" <u>Allen</u>, 514 F.3d at 476 n.3 (citing <u>Klopfenstein v. PCC Flow Techs. Holdings, Inc.</u>, ARB Case No. 04-149, 2006 WL 3246904, at *13 (ARB May 31, 2006)). "This element is broad and forgiving," <u>Lockheed Martin Corp. v. Admin. Review Bd.</u>, 717 F.3d 1121, 1136 (10th Cir. 2013), and "[t]his test [was] specifically intended to overrule existing case law, which requires a whistleblower to prove that his protected conduct was a 'significant', 'motivating', 'substantial', or 'predominant' factor in a personnel action in order to overturn that action," <u>Marano v. Dep't of Justice</u>, 2 F.3d 1137, 1140 (Fed. Cir. 1993).

- 28 -

"Temporal proximity between the protected activity and the adverse action is a significant factor in considering a circumstantial showing of causation," Tice v. Bristol-Myers Squibb Co., 2006-SOX-20, 2006 WL 3246825, at *20 (Dep't of Labor Apr. 26, 2006) (internal citations omitted), and "[t]he causal connection may be severed by the passage of a significant amount of time, or by some legitimate intervening event." Halloum v. Intel Corp., ALJ No. 2003-SOX-0007, 2004 WL 5032613, at *16 (Dep't of Labor Mar. 4, 2004).

Plaintiff initially brought his claims to Wells Fargo in late November and early December of 2011. (See Second Am. Compl. (Doc. 36) ¶ 13). Plaintiff then continued to pursue these claims internally despite first being told that his complaints were being investigated and finally being given instructions to stop raising the issue. (See, e.g., id. ¶ 52.) The report from the internal investigation that Wells Fargo commissioned was finalized on July 23, 2012. (Id. ¶ 44.) That same day, Plaintiff was issued a "Final Warning." (Id. ¶ 79.) Finally, Plaintiff apparently sent an email to individuals at Wells Fargo entitled "Whistleblower Evidence for the SEC and FINRA, How to Manipulate a Financial Plan" sometime in the fall of 2012, although the court can find no copy of this email in the record.

(Id. ¶ 101.) Plaintiff was terminated shortly thereafter on October 8, 2012. (Id.) Given that this element is "broad and forgiving," *Lockheed*, 717 F.3d at 1136, on these facts Plaintiff has alleged enough to show, at least at this stage, that his reporting activities were a contributing factor in his termination.

## C. **Alternative Reasons for Termination**

Under SOX, "[i]f the plaintiff carries his burden, the employer may nonetheless defeat the plaintiff's claim for relief by showing by clear and convincing evidence that the employer would have taken the same unfavorable personnel action in the absence of [the protected activity]." *Livingston*, 520 F.3d at 351 (internal quotations and citations omitted). Defendant argues that Plaintiff's termination was unrelated to his whistleblowing activities, and was instead tied to his public disclosure of confidential internal company documents. (See Def.'s Mem. (Doc. 38) at 16 n.9.) Defendant points to Plaintiff's own pleadings to show that he publicly disclosed documents that were marked "Internal Use Only" and argues that this was the primary reason he was terminated. (Id. (citing Second Am. Compl. (Doc. 36) ¶¶ 63, 69).) Plaintiff's Second Amended Complaint also details instructions from a Wells Fargo

employee named William Spivey that are consistent with this concern. (See Second Am. Compl. (Doc. 36) ¶¶ 77-78 (alleging that Plaintiff was instructed to take down his public blog and to cancel his CPA teaching events).)

However, while Defendant's evidence may show that Plaintiff was violating company policy, the evidence is not clear and convincing that these violations were actually <u>why</u> he was terminated.  There is nothing in the record showing the internal process used to terminate Plaintiff, or any document or affidavit detailing the rationale behind that decision. Further, Defendant's brief argues only that Plaintiff's disclosure of internal documents was a "primary" reason why he was terminated. (See Def.'s Mem. (Doc. 38) at 16 n.9.) Plaintiff, however, is only required to prove that his whistleblowing was <u>a</u> contributing factor, <u>Livingston</u>, 520 F.3d at 344, 351-52, something that could be true even assuming his disclosure of internal information played a more primary role in his termination.  As such, Defendant has failed to meet its burden of showing that Plaintiff would have been terminated absent his whistleblowing activities.

## VI.  CONCLUSION

For the reasons set forth herein, **IT IS HEREBY ORDERED** that Defendant's Motion to Dismiss (Doc. 37) is **GRANTED IN PART AND DENIED IN PART** and that Plaintiff's Second Amended Complaint (Doc. 36) is **DISMISSED** as to all claims except for his claim for retaliation under Sarbanes-Oxley, specifically as it relates to his raising of concerns regarding whether government loans were properly disclosed in Wells Fargo's SEC filings from 2008 and 2009.

This the 17th day of February, 2016.

_____
United States District Judge