IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

GEORGE HARTZMAN,                    )
                                    )
            Plaintiff,              )
                                    )
    v.                              )        1:14CV808
                                    )
WELLS FARGO ADVISORS, LLC,          )
                                    )
                                    )
            Defendant.              )


## MEMORANDUM OPINION AND ORDER

**OSTEEN, JR., District Judge**

Presently before this court is a Motion for Summary Judgment filed by pro se Plaintiff George Hartzman ("Hartzman") (Doc. 107), and a Motion for Summary Judgment filed by Defendant Wells Fargo Advisors, LLC ("Wells Fargo") (Doc. 124). Both parties have responded to the respective opposing party's motion (Docs. 140, 135), and both parties have filed a reply (Docs. 147, 146). This matter is now ripe for resolution, and for the reasons stated herein, Defendant's motion will be granted and Plaintiff's motion will be denied.

## I.    PROCEDURAL HISTORY

Plaintiff commenced this action on September 22, 2014, by filing a complaint alleging that Defendant retaliated against him for reporting Defendant's allegedly fraudulent practices, in

violation of the Sarbanes-Oxley whistleblower protection provisions set forth in 18 U.S.C. § 1514A(b). (See Complaint ("Compl.") (Doc. 1).) Plaintiff then amended his Complaint, filing a "Supplement to Initial Complaint" that included attachments setting forth additional factual allegations. (See Suppl. to Initial Compl. (Doc. 8).) Plaintiff moved to amend his pleadings a second time, filing alongside his motion a proposed "First Amended Complaint" that was 144 pages in length. (Docs. 24, 24-1.) The Magistrate Judge granted in part and denied in part Plaintiff's motion, allowing Plaintiff to amend his pleading only as to his Sarbanes-Oxley retaliation claim, but ordering him to do so "without the addition of John Stumpf or Robert Steel as Defendants or the inclusion of any causes of action beyond his claim of retaliation related to the Sarbanes-Oxley Act." (Mem. Op. & Order (Doc. 35) at 19.) Plaintiff filed a Second Amended Complaint on March 27, 2015 (Doc. 36). Thereafter, Defendant moved to dismiss, and the issue was fully briefed. (See Docs. 37-40.)

On February 17, 2016, this court filed a Memorandum Opinion and Order granting Defendant's Motion to Dismiss in part. (Doc. 43.) That order dismissed all of Plaintiff's causes of action for failure to state a claim save one: a retaliation claim arising under the Sarbanes-Oxley Act that related to his raising

of concerns regarding whether government loans were properly disclosed in Defendant's filings from 2008 and 2009 with the Securities and Exchange Commission ("SEC"). (Id. at 32.) Plaintiff and Defendant have moved for summary judgment on that one remaining claim. (Docs. 107, 124.)

## II.   **LEGAL STANDARD**

Summary judgment is appropriate where an examination of the pleadings, affidavits, and other proper discovery materials before the court demonstrates that no genuine issue of material fact exists, thus entitling the moving party to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986). The moving party bears the burden of initially demonstrating the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323.

If the moving party has met that burden, then the nonmoving party must persuade the court that a genuine issue remains for trial. This requires "more than simply show[ing] that there is some metaphysical doubt as to the material facts"; the "nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986) (citations omitted) (quoting Fed. R. Civ. P. 56(e)). In considering a motion for summary judgment, the court is not to

weigh the evidence, but rather must determine whether there is a genuine dispute as to a material issue. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).

Nonetheless, the court must ensure that the facts it considers can be "presented in a form that would be admissible in evidence" and that any affidavits or evidence used to support or oppose a motion are "made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." See Fed. R. Civ. P. 56(c)(2), (4).

The court must view the facts in the light most favorable to the nonmoving party, drawing inferences favorable to that party if such inferences are reasonable. Anderson, 477 U.S. at 255. However, there must be more than a factual dispute, the fact in question must be material, and the dispute must be genuine. Fed. R. Civ. P. 56(c); Anderson, 477 U.S. at 248. A dispute is only "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

III. **FACTUAL BACKGROUND**

Hartzman worked as a financial advisor for Wells Fargo until he was terminated in October of 2012. (Second Amended Complaint ("Second Am. Compl.") (Doc. 36) ¶ 1; Declaration of

William Spivey ("Spivey Decl.") (Doc. 80) ¶ 1.)[1] William Spivey ("Spivey") was Hartzman's direct supervisor from approximately 2002 through October 2012. (Spivey Decl. (Doc. 80) ¶ 1.) While employed by Wells Fargo, Hartzman raised "federal criminal concerns" through a confidential company ethics reporting channel, "EthicsLine". (Second Am. Compl. (Doc. 36) ¶ 3.) Hartzman raised his concerns by contacting the Wells Fargo EthicsLine on three different occasions, including November 29, 2011, December 2, 2011, and December 3, 2011. (EthicsLine Complaints (Docs. 126-4, 126-5, 126-6).) The EthicsLine Complaints seemed to assert that Wells Fargo violated its internal code of ethics and its Securities and Exchange Commission ("SEC") reporting requirements by omitting from its filings that it had received "secret loans"[2] from the Federal Reserve. (Id.) For documentation available concerning the incident, the EthicsLine Complaints list "plenty," "bloomberg foia request" and "bloomberg." (Doc. 126-4 at 4; Doc. 126-5 at 5; Doc. 126-6 at 4.)

---

[1] All citations in this Memorandum Opinion and Order to documents filed with the court refer to the page numbers located at the bottom right-hand corner of the documents as they appear on CM/ECF.

[2] These loans are apparently funds that Wells Fargo received access to under the federal Term Auction Facility during the financial crisis.

Brian Mixdorf ("Mixdorf"), a Senior Agent in Corporate Investigations for Wells Fargo, was assigned to address Hartzman's EthicsLine Complaints. (Declaration of Brian Mixdorf (Doc. 91) ¶¶ 1, 2; Deposition of George Hartzman ("Hartzman Dep.") (Doc. 130-1) at 64.) Mixdorf contacted Hartzman on December 5, 2011, via email. (Doc. 126-8 at 2.) Hartzman responded to Mixdorf and provided him with additional materials regarding his complaints entitled "What To Do Now Hartzman Tactical Allocation." (Id. at 1; see Hartzman Dep. (Doc. 130-1) at 65.)

Mixdorf thereafter scheduled a call with Hartzman to discuss Hartzman's concerns and the nature of his complaints. (See Doc. 126-8; Deposition of Mixdorf ("Mixdorf Dep.") (Doc. 129-7) at 3.) Mixdorf testified that the EthicsLine Complaints were "very confusing" and that the telephone conversation with Hartzman was "very, very confusing." (Mixdorf Dep. (Doc. 129-7) at 4.) Mixdorf testified that as a result of the telephone call with Hartzman, he contacted security because "the nature of [Hartzman's] actions" caused him to feel "harassed" and to become concerned with his personal safety, with Hartzman's personal safety, and with the safety of other people at the branch. (Id. at 6-7, 11.) Mixdorf testified that he "looked into

[Hartzman's] concerns the best [he] could," and then closed his portion of the case. (Id. at 3, 9.)

On December 8, 2011, December 19, 2011, and January 4, 2012, Hartzman emailed Mixdorf with various questions and requesting an update. (Docs. 126-10, 127-1, 127-2.) Mixdorf advised Hartzman that "our case is closed" and to "confer with your manager if you feel the need." (Doc. 127-1 at 1; Doc. 127-2 at 1.) Mixdorf testified this meant that his portion of what he could investigate was completed, and further, that since becoming a Wells Fargo employee, he was trained that results of EthicsLine Complaints were not to be revealed to callers. (Mixdorf Dep. (Doc. 129-7) at 8-9; see Doc. 108-14.) On January 4, 2012, Hartzman then sent an email to his manager William Spivey with a copy to Mixdorf and another Wells Fargo employee Janet Eason ("Eason"), referencing his EthicsLine Complaints and attaching some of the documentation he had provided in the EthicsLine Complaints. (Doc. 127-3; Doc. 108-12.) Prior to that email, Spivey had been unaware of Hartzman's EthicsLine Complaints. (Deposition of William D. Spivey ("Spivey Dep.") (Doc. 129-9) at 2-3.)

Shortly thereafter, Ken Tolson ("Tolson"), an Employee Relations Consultant with Wells Fargo, was contacted. He emailed Hartzman to answer Hartzman's questions and stated in part

"[t]hank you for raising these concerns. They have been investigated and will be addressed. It is our practice not to share the outcome of investigations. However, you can rest assured your concerns have been taken seriously, investigated and will be addressed." (Doc. 127-4 at 17-18; <u>see</u> Doc. 108-15; Deposition of Ken Tolson ("Tolson Dep.") (Doc. 109-3) at 1-2.) In response to an email from Hartzman on January 5, 2012, Tolson again advised him that "we do not share the results [of the investigation] or how it will be addressed", and encouraged Hartzman to discuss other concerns with his manager. (Doc. 127-4 at 14-15; Doc. 127-10 at 1.) In response, Hartzman emailed Tolson (with copies to Mixdorf, Spivey, and Eason) with more questions and various statements regarding, for instance, fiduciary duties. (Doc. 127-4 at 11-13.) He also sent copies of these emails to three Wells Fargo employees in auditing to whom he had never spoken previously. (Doc. 127-4 at 1, 11; Hartzman Dep. (Doc. 130-1) at 82-84.)

On January 19, 2012, Hartzman emailed Mixdorf, Spivey, Eason and Tolson, as well as three other Wells Fargo employees, with various information relating to his EthicsLine Complaints and with a subject line "[p]lease provide an update on this ethics issue." (Doc. 127-5 at 2-10; Doc. 127-6.) Spivey responded stating "George, I thought we agreed that you would

stop this," and "[y]ou have been warned to stand down from this." (Doc. 127-5 at 1-2.) Hartzman replied that he "would like to escalate this up the management chain." (Doc. 109-8.) Hartzman also tried to call several Wells Fargo employees regarding his emails including Danny Ludeman ("Ludeman"), who Hartzman understood "ran Wells Fargo Advisors." (Hartzman Dep. (Doc. 130-1) at 91-92.)

On February 14, 2012, Hartzman had a discussion via email with Wells Fargo Managing Director Aaron Landry ("Landry"), who had been contacted by Spivey after Hartzman's request to escalate. (Doc. 127-7; Doc. 109-9.) Hartzman requested an "update on the ethics thing" and who "at the region" was handling it. (Doc. 127-1 at 1.) Landry replied that "I am your contact and will facilitate your inquiry and allegation." (Id.) On February 22, 2012, Hartzman sent an email to Landry and six other Wells Fargo employees with subject line "[p]lease provide an update on the ethics thing" and containing EthicsLine Complaints documentation and apparent quotes from Robert Dahl and Bruce Judson. (Doc. 127-8.) Landry responded via email stating that "the region is looking into your concerns and [I] will be back to you when we have a response." (Doc. 127-9.)

On March 4, 2012, Hartzman sent an email to at least 13 Wells Fargo employees, including Ludeman and the CEO of Wells

Fargo Corporation, asking for an update and attaching some EthicsLine Complaints information that Hartzman had attached to several of the other previous emails. (Doc. 128-1.) Mixdorf responded to the email on March 9, 2012, at 10:06 a.m. advising Hartzman that "the Company received your initial Ethics Line allegations. The Company's practice is not to share information relating to its review of such allegations. . . . To the extent you continue to raise the same issues . . . , you will not receive any further response." (Doc. 128-2 at 1.) Mixdorf also advised Hartzman in the email of the following:

> I would like to remind you that we expect that you, like all other Team Members, will use the appropriate channels when raising an issue, meaning that issues should be raised to the appropriate contact person, and not others. The investigations group that I am a part of is charged with investigating Ethics Line allegations, so your complaints have made it to the right place. Your continuous requests for updates from individuals with no knowledge of or involvement with your complaints are unproductive, interfere with the conduct of business, and hinder the Company's review of your allegations. Accordingly, the Company expects that all future communications regarding your Ethics Line allegations will be directed only to my attention (or others I may designate to assist with the Company's review of your allegations).
>
> If you have a workplace concern, you may contact HR Advisor at 1-866-649-9589. With respect to any other questions that pertain to your business, please continue to direct your inquiries to your manager.
>
> Once again, we take your concerns seriously. Please advise if you have an available time next Monday or

Tuesday to discuss your new allegations in more detail.

(Id. at 1-2.) Hartzman responded at 10:13 a.m. and 11:13 a.m. by emailing the same group of Wells Fargo employees, in addition to Mixdorf and Spivey, again asking for an update and including information he had provided in previous emails. (Doc. 110-5; Doc. 128-3.)

On March 13, 2012, Hartzman was issued a Formal Warning stating that "you have repeatedly requested updates on your Ethics Line complaint from individuals with no knowledge of or involvement in your complaints. You have been advised repeatedly . . . that the Company's practice is not to share information relating to its review of such allegations." (Doc. 126-1 at 1.) The warning also noted that "[o]n Friday, March 9 . . . [y]ou were also explicitly directed not to involve other team members who were not involved in or responsible for addressing your concerns." (Id.) However, "[m]inutes after receiving the e-mail [from Mixdorf] you then sent an e-mail, requesting yet again an 'update' from 16 senior leaders across WBR and Wells Fargo." (Id.) The warning further stated that such "insubordinate conduct is not acceptable and will not be tolerated at Wells Fargo. . . . If this conduct continues, you may be subject to

further corrective action up to and including termination of your employment." (Id. at 2.)

On March 26, 2012, Spivey emailed Hartzman advising Hartzman to contact him with questions about the Formal Warning or other client/business concerns; to contact HR Advisor with workplace concerns; to contact the new investigator from the Corporate Investigations team about his EthicsLine concerns; and providing Hartzman with advice on his Asset Advisor accounts. (Doc. 128-4.) Spivey also emailed Hartzman on March 28, 2012, providing him with additional advice and instructions. (Doc. 111-10.) Spivey's reference to a new investigator was because after Hartzman made complaints against Mixdorf alleging he violated his code of ethics, a new investigator from the Corporate Investigations team was assigned. (Hartzman Dep. (Doc. 130-1) at 95-96.) However, Hartzman declined to speak with the new investigator. (Id. at 97-98.)

On May 1, 2012, Hartzman received a Memorandum of Warning for his "failure to comply with Wells Fargo Advisors' policy regarding documentation of ongoing advice section 15.F.4 of associates guide." (Doc. 126-2 at 1.) The warning further stated that "[y]ou are hereby directed to immediately comply with the Firm's policies and procedures . . . [and] material failure to comply with this Memorandum of Warning or any other Firm policy

or procedure may result in further disciplinary action, including termination of your employment." (<u>Id.</u> at 1-2.)

On May 8, 2012, Spivey sent Hartzman an email "in response to your recent emails asking about whether the Company has obtained material loans that it has not disclosed. I have looked into your questions and am writing to provide you with a response on behalf of the Company." (Doc. 129-6.)

Thereafter, in June 2012, Hartzman advertised, via the internet, a seminar for certified public accountants entitled "George Hartzman's Wells Fargo Whistleblower Filing and the Accounting Industry in Chapel Hill" to take place on June 21, 2012. (Doc. 128-5; Hartzman Dep. (Doc. 130-1) at 33-34, 110.) Wells Fargo had previously approved Hartzman to teach seminars, which were unaffiliated with Wells Fargo, but it was conditioned upon Hartzman not disclosing his position with Wells Fargo in connection with promoting or conducting the seminars. (Spivey Decl. (Doc. 80) ¶ 4(c); Hartzman Dep. (Doc. 130-1) at 111.) Therefore, Hartzman's advertisement violated Wells Fargo policies, of which he was aware. (Spivey Decl. (Doc. 80) ¶ 4(c); Hartzman Dep. (Doc. 130-1) at 29-30.) Spivey told Hartzman to remove any advertisements regarding the seminar and to cancel the event, which Hartzman agreed to do. (Doc. 128-6.)

Wells Fargo also designates certain information and documents as "internal use only" in order to comply with regulatory requirements and to protect confidential information. (Spivey Decl. (Doc. 80) at ¶ 4(d).) Hartzman was aware of these policies. (Hartzman Dep. (Doc. 130-1) at 28-30.) However, Hartzman posted on his public blog various "internal use only" documents and internal emails. (Doc. 128-8; Hartzman Dep. (Doc. 130-1) at 34.) Spivey instructed Hartzman to remove the portions of the blog that violated Wells Fargo policies. (Spivey Decl., Ex. 1 (Doc. 80-1) at 2.)

On July 23, 2012, Hartzman was issued a Final Warning in relation to his violations concerning the seminar advertisement and his blog postings. (Doc. 126-3.) The warning instructed Hartzman to comply with all Wells Fargo policies and to immediately remove any information in violation of the policies from his blog. (Id. at 3.) The warning advised that "[i]f further infractions of this nature occur again at any time . . . , your employment will be terminated immediately, as this is a Final Warning resulting from your continued violation of Firm policy despite repeated warnings. Further violations of other Firm policies may also lead to immediate termination." (Id.)

During this time, Wells Fargo decided to bring in an outside investigator to perform a review of Hartzman's complaints. (Spivey Dep. (Doc. 129-9) at 7.) Wells Fargo retained Hank Sanchez ("Sanchez"), Associate Director of Oyster Consulting, LLC, who had not previously done business with Wells Fargo. (Deposition of Henry Sanchez, Jr. ("Sanchez Dep.") (Doc. 129-10) at 7.) Sanchez was given "carte blanche from Wells [Fargo] to do whatever [he] needed" to investigate Hartzman's concerns. (Sanchez Dep. (Doc. 129-10) at 7-8.) Thereafter, Sanchez met with Hartzman on July 2, 2012, to discuss Hartzman's concerns. (Dep. of Sanchez (Doc. 129-10) at 6-7.) Following his investigation, Sanchez prepared a report of findings. (See id. at 4-5.) Sanchez also spoke with Hartzman and Spivey on July 20, 2012, to advise Hartzman of his findings. (Dep. of Sanchez (Doc. 129-10) at 4-5; Dep. of Spivey (Doc. 129-9) at 8.)

On September 10, 2012, Hartzman sent an email to thousands of recipients, including non-Wells Fargo employees, entitled "Whistleblower Evidence for the SEC and FINRA: How to Manipulate a Financial Plan." (See Hartzman Dep. (Doc. 130-1) at 8.) This email contained Wells Fargo "internal use only" information in violation Wells Fargo policies. (See Hartzman Dep. (Doc. 130-1) at 10-12, 23-24.) Hartzman admitted he sent the email to approximately 2,400 individuals, including Wells Fargo customers

and individuals he did not know. (Spivey Decl. (Doc. 80) at 5; Hartzman Dep. (Doc. 130-1) at 8, 17.) Hartzman also admitted that he was aware of the Wells Fargo policies that prohibit sharing "internal use only" information with people outside of Wells Fargo. (Hartzman Dep. (Doc. 130-1) at 18, 28-29.)

When Spivey learned of the email, he contacted the Wells Fargo Human Resources and Compliance departments. (Spivey Decl. (Doc. 80) ¶ 7.) Spivey also contacted Hartzman and set up an interview between Hartzman and Wells Fargo compliance investigators regarding the email. (Hartzman Dep. (Doc. 130-1) at 13.) On October 8, 2012, Spivey and Landry notified Hartzman that he was being terminated because of the September 10, 2012 email. (Id. at 22.)

On January 30, 2013, Hartzman filed a complaint with the Occupational Safety and Health Administration ("OSHA"), alleging that Wells Fargo "discriminated against him in violation of SOX [the Sarbanes-Oxley Act]." (OSHA Letter (Doc. 128-10) at 2.) On July 2, 2013, OSHA entered a decision finding that there was "no reasonable cause to believe that [Wells Fargo] violated SOX" and dismissed the complaint. (Id. at 1-2, 4.) Plaintiff commenced this action on September 22, 2014.

## IV.  __ANALYSIS__

Plaintiff claims that Wells Fargo retaliated against him for whistleblowing, in violation of the Sarbanes-Oxley Act. Title VIII of SOX is designated as the Corporate and Criminal Fraud Accountability Act of 2002. Section 806 of this Act, codified at 18 U.S.C. § 1514A, provides "whistleblower" protection to employees of publicly traded companies. SOX prohibits retaliation against an employee who "provide[s] information, cause[s] information to be provided, or otherwise assist[s] in an investigation regarding any conduct which the employee reasonably believes constitutes" mail, wire, or securities fraud, a violation of any rule or regulation of the SEC, or a violation of any federal law relating to fraud against shareholders. 18 U.S.C. § 1514A(a)(1).

A plaintiff asserting a SOX whistleblower claim must prove, by a preponderance of the evidence, that: "(1) []he engaged in protected activity; (2) the employer knew that []he engaged in the protected activity; (3) []he suffered an unfavorable personnel action; and (4) the protected activity was a contributing factor in the unfavorable action." Feldman v. Law Enf't Assocs. Corp., 752 F.3d 339, 344 (4th Cir. 2014) (footnote omitted). In this case, there appears to be no dispute as to the second and third elements that Wells Fargo was aware of

Hartzman's alleged protected activity, and that Hartzman suffered an adverse personnel decision when he was given formal warnings and ultimately terminated. Wells Fargo, however, disputes that Hartzman can prove the first and fourth elements.

Protected activity, as required in the first element, is "report[ing] conduct that [the employee] reasonably believes constituted a violation of [certain] federal law[s]." Id. at 344 n.5 (internal quotation marks and citation omitted). Under this standard, a plaintiff need not prove that the employer's conduct actually constituted fraud, only that the employee had "both a subjective belief and an objectively reasonable belief" that the conduct was illegal. Welch v. Chao, 536 F.3d 269, 277 n.4 (4th Cir. 2008). An objectively reasonable belief is present when "a reasonable person in [Plaintiff's] position would have believed that the conduct constituted a violation." Livingston v. Wyeth, Inc., 520 F.3d 344, 352 (4th Cir. 2008) (emphasis added). As such, to qualify for protection, Hartzman's belief that the alleged activities were illegal must have been objectively reasonable to a person with his years of experience as a financial advisor and as a teacher of CPA ethics courses.

Hartzman contends that he "blew the whistle" regarding Wells Fargo's failure to include certain funds received from the Federal Reserve (the "secret loans") in their SEC filings from

2008 and 2009. (<u>See</u> Second Am. Compl. (Doc. 36) ¶¶ 12, 60.)
There is no dispute as to Hartzman's <u>subjective</u> belief that
Wells Fargo was violating the law. Wells Fargo's argument is
that Hartzman cannot establish an objectively reasonable belief
that these actions violated the law.

As to the fourth element, "[a] contributing factor is 'any
factor, which alone or in combination with other factors, tends
to affect in any way the outcome of the decision.'" <u>Allen v.
Admin. Review Bd.</u>, 514 F.3d 468, 476 n.3 (5th Cir. 2008) (citing
<u>Klopfenstein v. PCC Flow Techs. Holdings, Inc.</u>, ARB Case No. 04-
149, 2006 WL 3246904, at *13 (ARB May 31, 2006)). "This element
is broad and forgiving," <u>Lockheed Martin Corp. v. Admin. Review
Bd.</u>, 717 F.3d 1121, 1136 (10th Cir. 2013), and "[t]his test
[was] specifically intended to overrule existing case law, which
requires a whistleblower to prove that his protected conduct was
a 'significant', 'motivating', 'substantial', or 'predominant'
factor in a personnel action in order to overturn that action."
<u>Marano v. Dep't of Justice</u>, 2 F.3d 1137, 1140 (Fed. Cir. 1993).
"Temporal proximity between the protected activity and the
adverse action is a significant factor in considering a
circumstantial showing of causation," <u>Tice v. Bristol-Myers
Squibb Co.</u>, 2006-SOX-20, 2006 WL 3246825, at *20 (Dep't of Labor
Apr. 26, 2006) (internal citations omitted), and "[t]he causal

- 19 -

connection may be severed by the passage of a significant amount of time, or by some legitimate intervening event." <u>Halloum v. Intel Corp.</u>, ALJ No. 2003-SOX-0007, 2004 WL 5032613, at *16 (Dep't of Labor Mar. 4, 2004). Wells Fargo argues that Hartzman has no admissible evidence to show that the alleged protected activity contributed to his termination, and that Hartzman's intervening policy violations caused his termination.

Wells Fargo further argues that even if this court were to find that Hartzman established a prima facie case, Wells Fargo has sufficient evidence to establish that it would have taken the same action, terminating Hartzman, in the absence of the protected activity. Under the burden-shifting framework of SOX whistleblower claims, "[i]f the plaintiff carries his burden, the employer may nonetheless defeat the plaintiff's claim for relief by showing by clear and convincing evidence that the employer would have taken the same unfavorable personnel action in the absence of [the protected activity]." <u>Livingston</u>, 520 F.3d at 351 (internal quotation marks omitted) (alteration in original).

Assuming without deciding that Hartzman satisfied his prima facie burden under SOX, this court finds that Wells Fargo has presented clear and convincing evidence detailing the rationale behind the unfavorable personnel actions, including the decision

to terminate Hartzman, and demonstrating that such actions were tied to numerous policy violations, such as his public disclosure of confidential internal company documents after being repeatedly warned, and that such actions would have occurred in the absence of any protected activity. Wiest v. Tyco Elecs. Corp., 812 F.3d 319, 322, 333 (3d Cir.), cert. denied, 137 S. Ct. 82 (2016) (affirming summary judgment where employer demonstrated that it would have taken the same actions with respect to employee "given the thorough, and thoroughly documented, investigation conducted by its human resources director" because it is not the court's "role to second-guess a human resources decision that followed a thorough investigation").

Hartzman was aware of the Wells Fargo policies related to teaching seminars and to internal company documents, yet chose to violate those policies in advertising for his seminar, in posting inappropriate material on his public blog, and in sending a mass email with "internal use only" documents to non-Wells Fargo recipients. Hartzman was told in unequivocal terms that if he continued to violate those company policies, he would be subject to termination.

Hartzman was also told in unequivocal terms that he was not to send emails to Wells Fargo employees who were not involved in

the investigations of his complaints. He was provided with numerous other points of contact for his questions and was encouraged to provide information on any concerns he had, but that he was to adhere to Wells Fargo policies. See Formella v. U.S. Dep't of Labor, 628 F.3d 381, 393 (7th Cir. 2010) (terminated truck driver claimed retaliation in violation of Surface Transportation Assistance Act for his raising of safety concerns, but court held that "[a]lthough some allowance must be made for impulsive and emotional behavior on the part of a driver with safety-related concerns, he can nonetheless be expected to demonstrate civility and respect for his superiors in voicing those concerns.") Instead, minutes after being directed on this point, Hartzman sent a second email to the exact same recipients he was directed not to email. JDS Uniphase Corp. v. Jennings, 473 F. Supp. 2d 705, 712 (E.D. Va. 2007) (summary judgment appropriate when undisputed facts clearly and convincingly reflect that employer would have terminated employee for reasons unrelated to his alleged protected activity, such as his admitted disdain for, and deliberate disregard of, employer's policies and procedures).

Along with providing Hartzman with numerous points of contact for questions and concerns, Wells Fargo assigned at least three investigators, including an independent

investigator, to address Hartzman's EthicsLine Complaints and other concerns. However, Hartzman refused to even speak with one of the assigned investigators. Instead, Hartzman continued to violate company policies and sent another inappropriate email with internal and confidential documents to approximately 2,400 email addresses, knowing that some were not Wells Fargo employees. Hartzman was warned of possible termination and given several chances to comply, but chose to continue with conduct he knew violated established policies.

Hartzman's argument that Wells Fargo's reasoning is pretextual is unsubstantiated, as he has presented no evidence other than his own subjective interpretation of Wells Fargo's actions. An employee cannot show pretext by merely disagreeing with documented concerns. Hartzman cannot hide behind his belief that Wells Fargo accepted "secret loans." Whistleblower provisions are not "intended to be used by employees to shield themselves from the consequences of their own misconduct or failures." Trimmer v. U.S. Dep't of Labor, 174 F.3d 1098, 1104 (10th Cir. 1999). In short, Wells Fargo has shown by clear and convincing evidence that it would have terminated Hartzman in the absence of his EthicsLine Complaints. Therefore, Defendant's motion for summary judgment is granted on Plaintiff's claim for retaliation.

## V.   <u>CONCLUSION</u>

For the reasons stated herein, **IT IS HEREBY ORDERED** that Plaintiff's Motion for Summary Judgment (Doc. 107) is **DENIED,** that Defendant's Motion for Summary Judgment (Doc. 124) is **GRANTED**, and that this case is **DISMISSED**.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for a Hearing before Summary Judgment Deadline (Doc. 105) is **DENIED AS MOOT.**

**IT IS FURTHER ORDERED** that Defendant's Motion for Dismissal for Non-Compliance with Court Order (Doc. 158) is **DENIED AS MOOT.**

A judgment in accordance with this Memorandum Opinion and Order will be entered contemporaneously herewith.

This the 12th day of July, 2017.

_____
United States District Judge